GEORGE F. POOR, Appellant, v. INCORPORATED TOWN OF DUN-
COMBE et al., Appellees.

No. 45603.

FEBRUARY 17, 1942.

C. E. Richman and Maher & Mullen, for appellant.

Cor. Van de Steeg, for appellees.

HALE, J.—There are two cases in this appeal. One is an action in certiorari, in which the petition for the writ was filed on the 13th day of November 1939, known as No. 28343 in the district court of Webster county; the other is an action in equity for injunction, the petition being filed on the same day, known as No. 28344 in the district court of Webster county. The two cases were by agreement tried together, and the facts were made applicable to each case. In the hearing they were treated as one case and are so treated in the abstract, briefs, and arguments in this court. They involve the same facts, which are not greatly in dispute and are mainly by stipulation. The record is voluminous, the pleadings, stipulation, and exhibits covering more than 180 pages of printed abstract. We will only briefly refer to the main facts, but will set out as much as is necessary under each of the assignments of error.

The Town of Duncombe held a special election on November 14, 1938, at which the following question was submitted and carried:

"SHALL THE FOLLOWING PUBLIC MEASURE BE ADOPTED, To-wit: Shall the Town of Duncombe, in the County of Webster and State of Iowa, establish, erect, maintain and operate an electric light and power distribution system, including all the necessary poles, wires, machinery, apparatus, and other requisites of such system, and including the necessary transmission lines therefor, either within or without its corporate limits, the cost of construction thereof not to exceed $15,000.00, to be paid solely and only out of the earnings of said system, without the incurring of any indebtedness therefor by the Town of Duncombe, Iowa, and enter into contract with some persons, corporation or municipality for the purchase of electric current for light and power purposes for resale thereof?"

A proposed form of specifications and plans was adopted at a meeting of the town council on May 12, 1939. The proceedings relating thereto are set out hereafter. Afterward a

resolution was adopted, reciting the filing of the proposed plans and specifications, a form of contract covering municipal electric light and power distribution, and providing for notice of hearing before the council on May 17, 1940, and submission of bids at such hearing for the furnishing of electrical energy; and further providing that payment for the distribution plant would be made either by delivery to the contractor of revenue bonds bearing interest at 5 per cent, or by the payment of 90 per cent cash on engineer's monthly estimate of labor and material furnished and accepted and properly stored on the premises. At the May 17, 1940, hearing, a resolution was passed adopting the plans and specifications and form of contract, but the form of contract actually entered into is claimed by the plaintiff to vary from that provided for in the approved specifications and form. It was stipulated that the defendants propose to proceed with the construction and operation of an electric light and power distribution system in the Town of Duncombe, and the purchase and resale of electrical current and energy through such distribution system, unless enjoined therefrom. There is no electric light or power plant or electric generating plant in the Town of Duncombe. These matters are raised in the proceedings in both the certiorari and injunction suits. In the certiorari action the plaintiff claims that the proceedings of the town council were invalid and should be annulled, and in the injunction suit it is claimed that the contracts entered into with the Mankato Electric Company and the Gibbs-Cook Tractor & Equipment Company for the construction of an electric light and power distribution plant and the purchase of current and resale respectively are invalid and should be cancelled.

On the consolidation of the cases for trial the court rendered decrees finding the equities with the defendants and dismissing the plaintiff's petitions in both the certiorari and the injunction cases. Appeals were perfected from the decision, and, by stipulation and approval by the supreme court, the cases were consolidated on appeal, reserving to defendants the right to raise an issue as to the maintenance of both actions by the plaintiff at the same time.

Other facts appear in the opinion under the various questions submitted for our determination.

I. The right of the plaintiff to maintain this action as a taxpayer, an owner of taxable property, and a consumer of electrical energy, is assailed by defendants. They assert that the plaintiff cannot be heard or cannot prosecute either of the actions consolidated for trial. Defendants cite Iowa Public Service Co. v. City of Emmetsburg, 210 Iowa 300, 227 N. W. 514. In the majority opinion in that case it is held that a public utility corporation, operating in a city under a duly granted franchise, may not, solely as a taxpayer, maintain injunction to test the legality of an ordinance, on the grounds of unreasonableness of proposed rates and that the city has an option to purchase. As stated in such majority opinion, the primary question is whether the plaintiff utility company is a taxpayer in the sense that it is in any way affected as such, so that it may state that it is a real and proper party in the matter. This case was decided by a divided court, one member not participating and three dissenting. It was afterward distinguished in the case of Miller v. Incorporated Town of Milford, 224 Iowa 753, 276 N. W. 826, 114 A. L. R. 1423. Also defendants cite Iowa Public Service Co. v. Parsons, 272 N. W. 613. This case does not appear in the Iowa reports. It was an injunction case, and by the records of this court we find that the opinion was withdrawn and the appeal dismissed; hence the case is of no value as a precedent in holding that the plaintiff must show that his rights as a taxpayer will be seriously and irrevocably affected. Other cases cited refer only to the rule de minimis non curat lex. Our recent cases hold that a taxpayer and consumer can maintain such an action without any showing of any special or particular damage to the plaintiff. Miller v. Incorporated Town of Milford, supra. See also, Central States Co. v. Town of Randall, 230 Iowa 376, 297 N. W. 804; Van Horn v. Des Moines, 195 Iowa 840, 191 N. W. 144; Abbott v. Iowa City, 224 Iowa 698, 277 N. W. 437.

In this case, where the plaintiff is a taxpayer, a citizen, and a user of electricity, he should have a right to appeal to the court from the action of his local council whenever his

rights as a citizen are, or appear to be, illegally trespassed upon. We hold that the plaintiff was entitled to bring action to assert his rights.

■ II. It is urged that certain violations of the election statutes invalidated the proceedings of the town council in attempting to let contracts thereunder. This objection is based on the fact that in neither the election in November 1938 nor the election in October 1939—the first of which purposed to build a distributive system under the Simmer law, and the other was the one at which the Gibbs-Cook contract was submitted to a vote—was there any compliance with the provisions of section 856 of the Code, requiring one of the poll books to be delivered, within two days after the election, to the county auditor. It is further claimed that at the election in November 1938, the official returns contained in the poll books were not attested by both of the parties who acted as clerks, but were signed by only one of them. A further irregularity is that, at both elections, the appointed judges and clerks were not all present and other persons were appointed to take their places as provided by section 736 of the Code. This fact is not disputed by the defendants, who state merely that the record thereof does not appear in the poll books of either of the elections, or elsewhere in the proceedings. No rights of any voters appear to have been infringed upon. It does not appear that the substituted judges and clerk were in any way disqualified to act as such. See Chambers v. Board of Directors, 172 Iowa 340, 154 N. W. 581.

The mere failure to file the poll book with the county auditor could not be held to vitiate the election. Plaintiff cites Jackman v. Black Hawk County, 156 Iowa 620, 627, 137 N. W. 906, 909. The decision in that case did not concern the validity of the election, but referred to one of the provisions of the mulct law as to a petition of consent which was required to be signed by a majority of the voters residing in the city and voting therein at the last city election, as shown by the poll books. Under the mulct law, the poll books by which the sufficiency of the signatures to a petition was to be determined were those filed with the county auditor and not those retained

by the local officer. In that case there was a failure to file and the authenticity of the signatures could not be determined; and the opinion states: "* * * under our statute, the right to be heard upon a petition of consent is not the right of the voter as such, but of those voters only who voted at the preceding election, and whose names are to be found upon the poll list—a list which we have defined and construed to be the one deposited with the county auditor." There being no such record, the names were rejected, but nowhere does the case challenge the validity of an election.

Plaintiff cites the case of Steeves v. New Market, 225 Iowa 618, 281 N. W. 162, an action in certiorari testing the validity of a special election held for the purpose of voting on a municipal light and power plant. The decree of the lower court holding the election valid was reversed on appeal because of irregularities. An examination of that case shows that nearly all the requirements of the election law, except as to notice, were disregarded -as, for instance, the canvass of the votes, required by statute to be made publicly, was made in secret; as to the public canvass, no record was made until a year and a day after the election, when the membership of the town council had changed; and, in addition to this, the ballots were not properly preserved, but were placed in the hands of a citizen, not an official of the town or county, but a man who had nothing to do with the election, where they remained for three or four weeks, after which they were taken to the auditor's office. Also the ballots or the books were never turned over to the town clerk, and there was no evidence to show that there was no opportunity to tamper with the ballots, and such ballots were not turned over to the proper officer. In fact, as the opinion itself states, none of the statutory requirements had been complied with at the time the council acted, and the election was never complete, even though the council had later undertaken to comply with some of such requirements. Under those circumstances, the court, on the principle that there was no means of determining whether the will of the voters had been complied with, necessarily held the election invalid. And the opinion further states what is the general

914

rule, that under some circumstances, where minor requirements are not complied with, the election might be complete. See 18 Am. Jur. 330, 331, sections 224, 225, as to irregularities, and cases cited thereunder, which hold the general rule to be that immaterial departures from the statutory mode of holding an election may be disregarded, but, if such failures to comply with the law were widespread and general and of so flagrant a character as to raise a doubt as to how the election would have resulted had they not occurred, they could easily be fatal. Such is the rule laid down in 29 C. J. S. 331, section 229, as to returns. The failure to return the result of a certain poll within the time prescribed by law does not of itself authorize the rejection of the vote of that poll; and, since it is the votes of the people and not the return of the officers that make an election, a failure to make returns from one or more precincts, no matter for what cause, will not invalidate the election unless it is shown that the votes not returned would have changed the result. See State v. Creston Mut. Tel. Co., 195 Iowa 1368, 191 N. W. 988, holding that the expressed will of the voters should not be thwarted or set aside because of irregularities, or even illegalities, which are not shown to have affected the result or to have prejudiced anyone. See also, Mack v. Independent School District of Corning, 200 Iowa 1190, 206 N. W. 145; Jackman v. Black Hawk County, supra. It is the rule that irregularities such as are here complained of cannot defeat the will of the people in the absence of any showing that the result would have been other than as reported. There was no such irregularity in either of these elections as to invalidate the proceedings of the town council thereafter in relation to the object of such elections.

III. The next point of dispute is the claim made by the plaintiff that a city or town which does not own an electric light or power plant cannot construct transmission lines for the distribution of electricity purchased by the municipality for resale to its inhabitants, and make payments for the cost of such construction out of future earnings, under the Simmer law. The defendants construe the statutes as authorizing such construction and payment.

It may be well at this point to note the various provisions of the statute relative to the rights and powers of municipalities in respect to electric light and power plants. References to the Code are to the Code of 1939, the provisions of which are the same as in the Code of 1935. Section 6127 provides that:

"Cities and towns shall have the power to purchase, establish, erect, maintain, and operate within or without their corporate limits, * * * electric light or power plants, with all the necessary * * * poles, wires, burners, machinery, apparatus, and other requisites of said works or plants, and lease or sell the same."

Section 6130 provides that:

"They may enter into contracts with persons, corporations, or municipalities for the purchase of * * * electric current for either light or power purposes, for the purpose of selling the same either to residents of the municipality or to others, including corporations, and shall have power to erect and maintain the necessary transmission lines therefor, either within or without their corporate limits, to the same extent, in the same manner, and under the same regulations, and with the same power to establish rates and collect rents, as is provided by law for cities having municipally owned plants."

Section 6131 states:

"No such works or plants shall be authorized, established, erected, purchased, leased, or sold, or franchise granted, extended, renewed, or amended, or contract of purchase provided for in section 6130 shall be entered into unless a majority of the legal electors voting thereon vote in favor of the same."

Section 6132 provides for the submission to vote of the questions provided for in sections 6127 to 6131, inclusive.

Sections 6134.01 to 6134.11, inclusive, contain what is known as the Simmer law, and the first section (6134.01) provides as to the power to pay for "any such plant, improvement or extension thereof out of the past earnings of the plant and/or out of the future earnings and/or may contract for

the payment of all or part of the cost of such plant, improvement or extension out of the future earnings from such plant, and may secure such contract by the pledge of the property purchased and the net earnings of the plant.'' The next section (6134.02) authorizes the issuance of revenue bonds payable from and secured by the net earnings of the plant, and which ''may also be secured by the pledge of the property purchased.'' These bonds are not to constitute a general obligation of the city or town, or be enforceable in any manner by taxation; and it is further provided that these revenue bonds may be delivered to the contractor in payment for the improvement or may be sold and the proceeds used to pay for such improvement, or may be used as collateral security for money borrowed to pay the cost of such improvement, but such loan can be repaid only out of the net earnings of the plant. Section 6134.03 provides for the refunding of bonds, and is not in question here. Section 6134.04 gives the form of the bond. Section 6134.05 is in relation to the sale of the bonds, which cannot be for less than par, plus accrued interest, and shall not be negotiated on a basis to yield more than 6 per cent per annum. Section 6134.06 again states that the contract shall not constitute a general obligation or be payable in any manner by taxation, and that such contract shall specify the maximum rate that may be charged the consumers, including the municipality; specifies that the city shall not be liable in any manner on account of the net earnings being insufficient for the payments provided for in the contract; and states that the rate of interest must also be specified in the contract. The next section (6134.07) provides that no such plant can be established without an election as provided by section 6131, the proposal of which election shall state the maximum amount to be expended. Section 6134.08 is a provision that where the proposed improvement shall cost $5,000 or more, the governing body shall give thirty days notice by publication of its intention to adopt proposed plans and specifications and proposed form of contract. The next section (6134.09) provides for the contents of the notice, directing that it shall state as nearly as practicable the extent of the

work, the kind of materials for which bids will be received, when the work shall be done, the time when proposals will be acted upon, "and shall also provide for competitive bids for the furnishing of electrical energy, gas, water or heat." Section 6134.10 is in relation to the execution of the contract, and provides that, following the notice, the governing body "shall consider the said plans and specifications, form of contract, and offers and propositions submitted in connection therewith, also any bids for the furnishing of electrical energy, gas, water, or heat, together with any objections thereto by an interested party," and grants the power to adopt such offers, propositions, or bids, and enter into such contract or contracts as they shall deem to be to the best interest of the municipality. Section 6134.11 provides for the record of the proceedings.

It was under these provisions of the Code that the defendant municipality acted; but the plaintiff contends that, while a municipality in Iowa may enter into a contract to purchase electric energy and build transmission lines as a distribution system for the resale of such electricity, under section 6130 of the Code, no such contract for a distribution system can be made and such system purchased out of the earnings, under the terms of the Simmer law. Plaintiff's contention is that the legislature intended that only an electric light or power plant, or the extension or improvement of such plant, could be paid for out of the earnings thereof, and that the Simmer law would be applicable only to pay for the plant or the extension or improvement of the same; that since revenue bonds can be paid only out of the earnings of the plant, it must be the earnings of the entire plant, and that the distribution system is only a part of the plant and not the plant itself. To this argument defendants respond that the words "electric light or power plants" in Code section 6127 refer to poles, wires, and other requisites of said work or plant; and the word "plant" may mean distribution system only, or a distribution system together with transmission lines where current is purchased at wholesale, or a distribution system and generating equipment. This is the principal point of difference between the parties, involving the meaning of the word "plant" as used in the Code.

Plaintiff refers to our various holdings in regard to the power of municipalities under these provisions of the Code —Brutsche v. Incorporated Town of Coon Rapids, 218 Iowa 1073, 256 N. W. 914; Wyatt v. Town of Manning, 217 Iowa 929, 250 N. W. 141; Greaves v. City of Villisca, 217 Iowa 590, 251 N. W. 766; Pennington v. Fairbanks, Morse & Co., 217 Iowa 1117, 253 N. W. 60; and Gunnar v. Town of Montezuma, 229 Iowa 734, 294 N. W. 895. We do not think that any of the cases cited support the plaintiff's proposition. The Brutsche case refers to the notice to bidders and what such notice shall contain, being only such as has previously been authorized by vote; but the opinion expressly says that it does not decide whether the provisions of section 6134.01 of the Code, read in connection with other sections cited, are broad or definite enough to permit purchasing, under the Simmer law, electrical energy as authorized by section 6130. The Wyatt case holds that proceedings under the Simmer law do not create a debt against the municipality, and concerns a disputed form of notice. The Pennington case has reference to the form of ballot. The Greaves case has reference to the form of proceedings under the ballot at the election in that it did not properly advise the electors of the essential elements of the proposition to be voted on. The case also was in relation to franchise, which is not a question in the present case. The Gunnar case (decided December 10, 1940) is cited by plaintiff as sustaining his contention. We do not so read the case, which was a suit to enjoin the town from purchasing an existing electric light and power plant under the Simmer law, the grounds claimed by the plaintiff in that case being that the proceeds for the purchase did not conform to the provisions of the Code. The holding was that the notice which was challenged was sufficient and that the town might purchase an existing completed plant. None of the cases cited touches upon the point in issue here except the Brutsche case, which does not decide it.

The argument of the plaintiff, therefore, is to the effect that, since, as they claim, the statute does not expressly authorize such proceedings as are here contemplated, under the Simmer

law, and since at no time has this court approved such proceedings thereunder, therefore there should be no authorization. We think the statute does authorize the construction of such a distribution plant. Defendants argue that the true and correct interpretation of the provisions of the Simmer law contemplates the establishing of a plant which may be a distribution system only or which may include generating equipment, and that authority for establishing either system has been vested in the designated officers of the town.

Defendants cite numbers of cases where the word "plant" has been defined. In 32 Words and Phrases (permanent edition) 616–624, a large number of definitions is given, covering many forms of business and manufacturing. The word has even been extended to cover the tracks of a municipal streetcar system, in Murphy v. Schwartz, 142 Wash. 69, 252 P. 152. Even a ladder has been considered a part of a plant. Grasselli Chemical Co. v. Davis, 166 Ala. 471, 52 So. 35. It has included land on which a mill was situated. Kendrick v. Lunsford, Tex. Civ. App., 150 S. W. 480. It may be real estate, as defined in Webster's New International Dictionary, which also gives, as one definition: "A set or group of parts in machinery, machine equipment, or the like, functioning together; as, an interlocking plant in a railroad switch mechanism." And in a Louisiana case, Brennan v. Sewerage & Water Board, 108 La. 569, 32 So. 563, it was held that a disposal plant, or sewer, although not yet connected with any machinery, was a plant. Many other definitions are to be found in the reports. The word "plant" as defined in the Century Dictionary, includes the "fixtures, machinery, tools, apparatus, appliances, etc., necessary to carry on any trade or mechanical business or any mechanical operation or process." In Old Colony Trust Co. v. Standard Beet Sugar Co., 8 Cir., Neb., 150 F. 677, 680, various definitions are given, as, from the Standard Dictionary, which defines it, among other things, as " ' the permanent appliances needed for any institution, as a post office.' " This decision also cites the Imperial Dictionary, where the word is defined to mean: " 'The fixtures, machinery, tools, apparatus, etc., necessary to carry on any trade or mechanical business.' " The case further cites

the Encyclopedic Dictionary: " 'The tools, machinery, apparatus, and fixtures as used in a particular business; that which is necessary to the conduct of any trade or mechanical business or undertaking.' " It will be seen from the decisions cited that the word is broadly and liberally applied, that no special form of machinery or appliance of any kind is necessary to constitute a "plant." A store, either wholesale or retail, might be considered as a plant, and yet such store is only for the distribution of articles, and need not, and does not ordinarily, produce such articles. Nor is there any reason why a mill or factory which purchases its power from an outside source may not be a plant. The same might be said of a bottling or packing establishment, which is merely for the arrangement and distribution of food or beverages produced at some distant point. And such is common usage of the word. We think that the word "plant" may be held to mean the distribution equipment, wires, and transmission lines, which may be necessary for distribution only, and need not necessarily include in the plant the production of the current to be distributed. We are satisfied that the Simmer law should be so construed.

IV. Plaintiff complains that the contract between the Town of Duncombe and the Mankato Electric Company for the construction of a distribution system was invalid because the provisions of such contract varied materially from those in the form of contract approved by, and the execution of which was authorized by, the town council, and that the bid of the Mankato Electric Company upon which said contract was based failed to respond to the specifications approved by the town council. The only material difference argued is as to the plan of payment for the work.

It will be necessary to examine the record of the proceedings. After the election the council adopted a resolution providing for notice of hearing before the council on May 17, 1940, and for the submission of bids. Notice of the May 17, 1940, meeting was published, which notice provided that the council proposed to adopt plans and specifications and form of contract for the proposed electric light and power distribution system in accordance with the proposed plans and specifications and

proposed form of contract on file with the town clerk. The notice required all proposals and bids in connection therewith to be filed with the town clerk, provided that objections could be made, and specified when the work was to begin and to be completed. The part of the notice with which we are here concerned provided for payment. This provision was that payment should be made as provided by alternate bid accepted in the proposed form of contract, either by delivery of electric light plant revenue bonds of the municipality, payable out of the earnings, or 90 per cent cash on engineer's monthly estimate of labor and material furnished and accepted and material accepted and properly stored on the premises. The notice provided further that the improvement was to be constructed under the authority granted by chapter 312 of the Code of 1939, and more particularly by sections 6134.01 to 6134.11, inclusive, and contained the usual reservation of right to reject any or all bids, and reference to proposed plans and specifications on file.

The council met, in response to such notice, on May 17, 1940; bids were received and opened; there were no objections to the bids, and a resolution was adopted approving and accepting the bid of the Mankato Electric Company for $10,584, and rejecting all other bids. The mayor and town clerk were authorized by such resolution to execute the contract in the form set out and attached to the plans and specifications. Thereupon, on the 17th of May 1940, the contract was executed by the Town by said officers, and by the Mankato Electric Company, providing for payment in cash as specified in the notice. A further provision in the contract was that it was understood and agreed "that this contract is issued and executed and the electric light plant revenue bonds to be sold in payment thereof are issued in pursuance of the authority granted said municipality by Chapter 312 of the Code of 1939 of Iowa, and more particularly by Sections 6134.01 to 6134.11, both inclusive."

It will thus be seen that the resolution and contract are in accord with the published notice in providing for the payment in cash. But the plaintiff urges that these do not correspond to the proposed form of contract in the plans and speci-

fications. The proposed form contains nine subdivisions; the contract entered into contains only seven. An examination of the proposed form, which was made a part of the specifications and which plaintiff claims varied from the contract actually executed, discloses that, as claimed by plaintiff, such form constituting a part of the specifications did not, in the so-called contract part, give a completed form for the alternative methods of bidding, that it was only completed as to one of the forms of payment. It did provide, as did the contract entered into, that the plans and specifications, proposal of the contractor, notice of public hearing, the resolutions and proceedings of the municipality in connection with the letting of the contract, were made an essential part of the contract as fully and with the same effect as if incorporated therein. This provision, it will be understood, was the same in both the contract actually entered into and in the form of contract made a part of the plans and specifications. Now, the specifications included, in reference to the bid which was submitted, a proposal designated "proposal for municipal electric light and power distribution system," addressed to the mayor and council, stating, as is usual in such proposals, that the bidder was acquainted with the local conditions, and with the plans and specifications on file; agreeing to furnish all labor, materials, equipment, machinery, etc., needed; recognizing that the town council had the right to reject any and all proposals; stating that the form of proposal should not be changed or added to in any respect, and that it was understood that the method of payment for the proposed work would be by revenue bonds, payable out of future earnings and not a general obligation. This did not mean anything other than that the system was to be financed by the issuance of such bonds. Payment could be made either in bonds or the proceeds thereof. The sixth paragraph of the proposal recites a full understanding of all the foregoing statements, and submits a bid, with alternate B filled out, which reads: "We the undersigned do propose to furnish all labor and material, tools and supplies, equipment and material and all things necessary to furnish, install and construct complete electric distribution system, in accordance

with the plans and specifications for the sum of Ten thousand five hundred eighty-four Dollars ($10,584.00) in cash.'' There was a further alternate C, which is immaterial.

The proposed form of contract was based on the first form of bid, and made no provision for payment in cash. It was a form only, and necessarily would have to be changed and adapted to the alternate B provided in the specifications, if accepted, and which was finally accepted. The form, except as to the method of payment in the bonds themselves, was followed in the contract finally adopted, and in the notice of the hearing and the resolution adopted by the town council. We think no contractor would be misled if he examined the plans and specifications, because the form of proposal which the contractor was to execute as his bid provided the different methods by which payment might be made. To set out in the plans and specifications a proposed form of contract for each of the different forms for each of the alternate bids would be a useless duplication. No one could fail to understand that the contract would finally be executed following the general form and providing for the method of payment which the council saw fit to adopt. We fail to find any variance such as to render invalid the contract. Blanks are left in the proposal, and alternate proposals are made in the specifications; and no contractor, nor any other person, would understand that the form of contract under one of the alternate systems of payment adopted would be word for word as in this whole general and tentative form.

The funds necessary for the completion of the work would have to be raised by the issuance of bonds, and it seems plain, from the proposed form, which provided for the different methods of payment, either that the completed contract would call for the delivery of the bonds themselves to the contractor, or the proceeds of such bonds when sold, at the option of the council. The contract is not open to the objection that there is no provision for the payment of all the amount to the contractor. Advance payment of 90 per cent is provided for; the remaining part of the consideration would necessarily be paid on the completion of the work, since the contract provides

what the total purchase price shall be. The reference to 90 per cent is only as to the time of payment. Weiss v. Town of Woodbine, 228 Iowa 1, 289 N. W. 469.

Many cases are cited by plaintiff on the subject of a contract not being responsive to call. In addition to the Weiss case above set out, plaintiff cites Urbany v. Carroll, 176 Iowa 217, 157 N. W. 852; Iowa Electric Light & Power Co. v. Incorporated Town of Grand Junction, 216 Iowa 1301, 250 N. W. 136; Brutsche v. Incorporated Town of Coon Rapids, 220 Iowa 1295, 264 N. W. 696; Weiss v. Woodbine, 229 Iowa 978, 295 N. W. 873; Interstate Power Co. v. Forest City, 225 Iowa 490, 281 N. W. 207; Iowa Electric Co. v. Town of Cascade, 227 Iowa 480, 288 N. W. 633, 129 A. L. R. 758; Interstate Power Co. v. Town of McGregor, 230 Iowa 42, 296 N. W. 770. Without undertaking to set out these cases more fully, we are satisfied that none will support the contention of the plaintiff as to the claimed variance. The contract must be authorized by the notice and authority of the governing body, and it seems to us that there has been a full compliance therewith in the contract finally adopted.

V. Plaintiff's next objection to the decree has reference to the contract for the purchase by the Town of electric current at wholesale, and does not refer to the distribution system. It is claimed by the plaintiff that the purchase contract between the Town and the Gibbs-Cook Tractor & Equipment Company is invalid, because the provisions of said contract varied materially from those in the form of contract for the purchase of electric current, and because the contract was entered into without competitive bidding.

There was a special election held in November 1938, submitting to the people the questions of the building of the distribution plant and whether there should be a contract for the purchase of electric current. The propositions carried, notice of hearing was published and hearing held on May 12, 1939, and the form of contract and plans and specifications were adopted at the meeting of the town council. No bids were received for the sale of electric energy or purchase thereof by the Town. A contract entered into for the construction of a distribution system was subsequently abandoned. In the plans

and specifications there was a form of agreement for the purchase of electric current. Thereafter, on September 22, 1939, no bids having been received for the sale of electric current, the council provided for the holding of a special election on October 24, 1939, at which there was submitted to the people the question: "Shall the town enter into the following contract?" This was the Gibbs-Cook Tractor & Equipment Company contract providing for the purchase by the Town of 7,000 K.W.H. monthly. Rates of payment were specified, of which there is no complaint herein, and the contract was to extend for ten years, with certain provisions in the event of failure, and an option to purchase. These provisions do not appear in the original form of electric-purchase contract approved on May 12, 1939. The question of whether or not this purchase contract should be adopted was submitted and carried at the special election of October 24, 1939. On November 2, 1939, this contract, which was the same as had been submitted to the people, was executed by the company and the Town. As heretofore stated, the blank form of contract in the plans and specifications submitted in 1938 might be considered only a tentative form. The voters had signified their willingness to purchase electricity, and, at the election in October 1939, explicitly approved the contract which was actually entered into, as required in section 6131 of the Code.

Plaintiff's objection that the contract for purchase of electricity was invalid on account of material variances from the tentative form of contract, we think is without merit, since the people directed, in the October 1939 election, that the contract as proposed should be adopted, and it was adopted. Plaintiff's objection that the notice calling for bids for the construction of the electric distribution system, to be considered on May 17, 1940, contained also a provision for considering bids for the furnishing of electricity, we do not think has merit. Why the provision was inserted in the notice we do not know, unless it was to comply literally with the provisions of Code section 6134.09, but the Gibbs-Cook contract had been entered into on November 2, 1939, following the special election on October 24th. In the notice there were no specifications for the furnishing of

electric current and no proposed form of contract. We do not understand that there were any bids for current offered or received. Plaintiff assumes that the question of purchase of current arises under the Simmer law. We do not understand that this proposition here considered for the purchase of electric current came within or comes within the provisions of the Simmer law. There is no such provision in the contract as is provided in Code section 6134.01, for payment of any part out of future earnings, and no provision in such contract for the issuance of revenue bonds. Contracts of that nature are provided for under Code section 6130. This method the council adopted, and the voters had before them the right to determine whether the specific contract proposed to be entered into should or should not be adopted. Nowhere throughout the proceedings, except the suggestion in the notice, does it appear that the purchase of current was intended to come within the provisions of the Simmer law, but the contrary appears. Under the system adopted and carried out, we think the interests of the taxpayers and of the Town were fully protected.

No claim is made herein that the contract was unreasonable or disadvantageous to the Town. Defendants cite Keokuk Waterworks Co. v. Keokuk, 224 Iowa 718, 732, 277 N. W. 291, 299, where it is said (quoting from 1 McQuillin, Municipal Corporations, 2d Ed., 925):

" 'When the authority to exercise the power appears, wide latitude is allowed in its exercise, and, unless some abuse of power or a violation of organic or fundamental right results, it will be upheld. A municipal corporation when exerting its functions for the general good, is not to be shorn of its power by mere implication. The intention to restrict the exercise of its powers must be manifest by words so clear as not to admit of two different or inconsistent meanings.' "

Defendants cite further, Molyneaux v. Molyneaux, 130 Iowa 100, 106, 106 N. W. 370, 372 (a school case), wherein it is said: "* * * the whole matter seems to have been ratified at the subsequent meeting of the electors * * *." We think it clearly comes within the provisions of sections 6130, relating to the purchase of utility products, and 6131, requiring an

election for the approval of the contract of purchase. This court has decided that towns have such right to enter into contracts of purchase. See Central States Co. v. Town of Randall, 230 Iowa 376, 297 N. W. 804, and cases cited therein; Meader v. Incorporated Town of Sibley, 197 Iowa 945, 198 N. W. 72.

Regarding the claim that the system adopted does away with competitive bidding, we call attention to a recent decision of this court, Weiss v. Town of Woodbine (decided in January, 1941, opinion by Garfield, J.), 229 Iowa 978, 984, 295 N. W. 873, 876, wherein it was held that a provision that the contractor should accept in payment revenue bonds was not an illegal restriction upon competitive bidding. The court says:

"In this connection, it must be remembered that if competitive bidding is required upon contracts of this kind, it is only because the statutes so require. The legislature has the undoubted power to dispense with competitive bidding if it chooses so to do." (Citing cases.)

Even when proceeding under the Simmer law, in which competitive bidding is required (Iowa Electric Co. v. Town of Cascade, supra), in section 6134.10 it is provided that the council shall have power to adopt such offer or offers, propositions, or bids, as they shall deem to the best interest of the municipality. As is said by Justice Bliss in Interstate Power Co. v. Town of McGregor, supra, 230 Iowa 42, 51, 296 N. W. 770, 774:

"There is no statutory provision requiring that either the lowest bidder, or the lowest responsible bidder at a letting under the Simmer Law should be selected."

That the contract herein was deemed to the best interest of the community is evident.

References by plaintiff to various authorities we do not think are in point. They largely include cases heretofore cited in this opinion. We think the objections by the plaintiff to the validity of the contract for purchase of current are without merit, and that the proceedings were valid.

■ VI. Defendants challenge plaintiff's right to commence and prosecute the certiorari and the injunction actions

at the same time, covering the same subject matter, and against the same defendants. Our rulings on other questions herein dispose of both cases which were consolidated for trial, and ruling on this question at this time is not important as to the determination of the questions involved. But our court has ruled on similar questions. See Federal Cattle Loan Society v. Taylor, 191 Iowa 837, 183 N. W. 459, and the more recent case of Yost v. Gadd, 227 Iowa 621, 626, 288 N. W. 667, 670, wherein it was held that the proceedings in certiorari were unnecessary since there was other adequate remedy.

It is our holding, in view of what we have hereinbefore stated, that the order and decree of the district court should be affirmed and the writ of certiorari annulled.—Affirmed.

BLISS, C. J., and STIGER, OLIVER, MILLER, and GARFIELD, JJ., concur.